HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| OSAMA EMARA, | No. 11-cv-6055-RBL |
| Plaintiff, | ORDER |
| v. | (Dkt. #38) |
| MULTICARE HEALTH SYSTEM, et al., | |
| Defendants. | |

## INTRODUCTION

Plaintiff, appearing *pro se*, has filed suit alleging that he was fired from his positions as a pharmacy technician by Defendant Multicare based on his race, national origin, and sex.  In response, Multicare claims that it terminated Plaintiff after 60-days of employment because he was working outside the scope of his job.  Multicare has moved for summary judgment.

## BACKGROUND

The facts are undisputed.  Plaintiff was admitted to the Pacific University School of Pharmacy in March 2010.  (Pl.'s Resp. at 2, Dkt. #50; Defs.' Mot. for Summ. J. at 7, Dkt. #38.) Following admission, Plaintiff obtained Washington licenses to practice as both a pharmacy technician and a pharmacy intern.  Plaintiff explains that an intern is essentially a "pharmacist in training, who is permitted by law to perform most of the tasks a pharmacist can"; a technician, on the other hand, "cannot perform many of the tasks . . . examples are counseling patients and transferring prescriptions."  ((Pl.'s Resp. at 2, Dkt. #50.)  Importantly, unlike an intern, technicians do not have assigned mentors who oversee their work directly.  According to

Order - 1

Multicare, "technicians are not permitted to perform [intern] function[s] under any circumstance, nor any other function [that] requires discretion." (Defs.' Mot. for Summ. J. at 8, Dkt. #38.)

In May 2010, Plaintiff applied with Multicare and met with Sunil Patel, the manager of Multicare's pharmacy services. (Pl.'s Resp. at 2, Dkt. #50.) Plaintiff apparently hoped to be hired as an intern, but because he had not yet begun pharmacy school, Multicare hired him as a technician, allowing him the possibility of later transitioning to an intern. (*See id.* at 4.)

Multicare, through Vafa Aflatooni, the pharmacy supervisor, hired Plaintiff under its standard 90-day introductory period, beginning on June 21, 2010. (Defs.' Mot. for Summ. J. at 5, Dkt. #38.) Employees within the introductory period are not subject to Multicare's regular personnel policies—specifically, its policies governing the termination of a long-term employee. (*Id.*) Multicare might therefore fire a new hire without explanation, without investigation into complaints, or in ways that might otherwise be different for long-term employees. (*Id.*)

There is no dispute that Plaintiff knew he was hired as a technician and not an intern—although Plaintiff stresses that he was licensed for both positions. Yet it is also undisputed that Plaintiff counseled patients regarding their medications without the supervision of a mentor. On August 7, 2010, pharmacist Debra Plant (also a defendant here) sent Mr. Aflatooni an email complaining of Plaintiff's conduct, which ultimately led to his termination.

> Hey Vafa,
>
> Is Osama [Emara] tracking intern hours? Does he know that he only gets credit for hours worked with RPh's that hold a preceptor license? I don't know which Rph's actually have them (I would be surprised if Everett has his, and Osama just spent most of the last two weeks with me and Ev at TFM), but there are a few hours that he worked with just me, that he would not be able to claim.
>
> And I am also going to copy this to Ken just for the sake of having it documented, but there was an issue last month - I can get you the exact date if you need it - it was while I was covering Renee's vacation in the ED, and I was the morning RPh and Belete worked the evening shift. This was, I believe, the first time I really worked with him, and was unaware of what he was actually being allowed to do. Osama told me that he was allowed to go to the floors and counsel unsupervised, but that he was unfamiliar with one of the medications that he was about to deliver and needed info on it. I was very uncomfortable with the idea of him even counseling on any medication, since he has not even started pharm school. I had him tell me what he was going to tell the pt about the pain med and Abx, but had to tell him more than once that he was to call the pharmacy and I would counsel them over the phone if they had not had the estrogen before. He was very pushy

about trying to get permission to counsel. At some point before he left to deliver the rxs, he casually asked me in an FYI manner, what my counseling points would be on estrogen. I was uncomfortable with the question, but I just said a few things very quickly, because I did not want him to think I would not help him if he had questions. He left to make the delivery, and shortly after, I get a call from Osama. He told me that the pt told him that she was having some vaginal bleeding and that the nurse told her to not take ibuprofen, and that he did not know what to tell her. I asked him if it was a new medication for the pt, and he said yes, and then I asked if he just counseled the pt, to which he replied that he had. I was very irritated and shocked to say the least!! I asked him to put the patient on the phone, but he was unable to because he didn't even call me from inside the patients room! I assume he did not want the pt to know that he did not know what he was talking about. So I told him that I would call the pts room and talk to them myself. When I called the pt, it was really awkward, because she thought she had already talked to the RPh. I talked to her about the bleeding, but I had no way of knowing what he else he had said. She sounded really confused and didn't really want to talk to me about the drug. She felt like she had already been counseled and was "informed" on the medication, but I went over it with her anyway. If he told her something wrong, I have no idea. When he came back down, he was very defensive and said I had given him permission and that I told him about the drug so that he could counsel. Later that day, in response to this situation, Belete told him that he was no longer allowed to deliver medications, and I was going to leave it at that. I was not going to say anything else, but with all the other concerns regarding him, I felt it appropriate to document this as well.

For the record, I do not trust him and am uncomfortable working with him, and feel that he is dishonest and manipulative. I do not believe he can be trusted to work unsupervised, and that he will try and do as much as he thinks that he can get away with. For the week and a half that I worked with him at TFM, he was not doing transfers under me and Everett. Hein filled in there for about an hour one day, and since Osama knew that Hein did not know what he was authorized to do, he informed Hein that he was going to do a transfer, and Hein, not knowing any different, told him that was fine. (He likes to take advantage of pharmacists that have not worked with him in order to get permission to do things that he has not really been authorized to do - similar to what he did with me and the counseling.) I took the phone after Osama spoke to the pharmacist and confirmed all the info, which Osama was none too happy about. Also this last week at TFM, he spent a LOT of time working on the back counter without anyone being able to monitor work he was doing - or if he was even doing work related stuff at all. At one point, I heard him talking on the phone at the back counter making recommendations (speaking in English) about sumatriptan and ibuprofen to someone on the phone. When he realized I was listening, he started speaking so quietly that I could not hear what he was saying. When I later asked who he was speaking to, he told me it was his "wife," and in a defensive tone, he asked me why I wanted to know. I told him that I had overheard drug related conversation. I don't know who he was talking to for sure, but I believe he usually speaks to his wife in his native tongue.

I feel he is really confused (I use this term lightly, as I feel it is actually more of a blatant disregard, not a failure on your part to explain his duties) about what he is authorized to do as an intern. He thinks that just because the law *allows* him to perform duties beyond what is allowed for techs, he feels that he is *entitled* to those privileges. But the extent to which he is able to execute those privileges, is at the discretion of the pharmacist under which is he is working - not the BOP, or even another off-duty pharmacist. He does not realize that it is a learning process, and that he needs to earn

>those privileges. Following the estrogen counseling incident, he made comments to Chris Iriarte saying, "doesn't she realize that I am an intern?" which reinforces the idea that he may not clearly understand what it means to be an intern at his level.
>
>Thanks so much for time and take care!
>
>Debra

(Pl.'s Resp., Dkt. #50-1 at 4.)  Mr. Aflatooni—who hired Plaintiff only 60 days earlier—fired Plaintiff two days after the email (on Plaintiff's next work day).

Plaintiff contends that "[a]lmost all pharmacists who worked with Plaintiff trained and allowed him to perform intern duties." (*Id.* at 2.)  Further, "[h]ad Mr. Patel held his promise to Plaintiff to be hired as an intern, Plaintiff's job title would not have been an issue." (*Id.* at 3.)  Further, Plaintiff makes clear that Plant was mistaken in her email: Plaintiff's wife is caucasian and speaks only English.

Based on these facts, Plaintiff brought claims under Title VII, 42 U.S.C. § 2000e; the Washington Law Against Discrimination ("WLAD"), Wash. Rev. Code § 49.60, under 42 U.S.C. § 1985, and for defamation and infliction of emotional distress.  (Am. Compl., Dkt. #5.)

## DISCUSSION

Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact which would preclude summary judgment as a matter of law.  Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to present, by affidavits, depositions, answers to interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient." *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  Factual disputes whose resolution would not affect the outcome of the suit are irrelevant to the consideration of a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In other words, "summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable [fact finder] could return a [decision] in its favor." *Triton Energy*, 68 F.3d at 1220.

Under Title VII, it is unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Similarly, under the WLAD, it is unlawful for an employer "to discharge or bar any person from employment because of age, sex, marital status, sexual orientation, race, creed, color, national origin, honorably discharged veteran or military status, or the presence of any sensory, mental, or physical disability . . . ." Wash. Rev. Code § 49.60.180. The two laws parallel each other and are generally considered in tandem. *See Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 966 (9th Cir. 2002). A plaintiff alleging both Title VII and WLAD claims must first establish a *prima facie* case, thereby shifting the burden to the defendant to provide a non-discriminatory reasons for termination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see also Chen v. State*, 86 Wash. App. 183, 189–90 (1997). Upon doing so, the burden then returns to the plaintiff, who must show that the employer's articulated reasons are pretextual. *Id.*

Plaintiff cannot make out a *prima facie* case. First, Plaintiff fails to provide any explanation for how Mr. Aflatooni acquired a discriminatory animus only 60 days after hiring him. *See, e.g.*, *Bradley v. Harcourt, Brace & Co.* 104 F.3d 267, 270–71 (9th Cir. 1996) ("We therefore hold that where the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory motive.")

Second, Plaintiff's primary complaint—that Plant believed he spoke Arabic with his wife—does not lead to the conclusion that Aflatooni fired Plaintiff for discriminatory reasons. Even in Plant's email was motivated by discriminatory animus, Plaintiff does not dispute that he was counseling patients unsupervised—the specific reason for his termination.

Third, Multicare's explanation for his termination cannot be called "pretextual." If Plaintiff—a technician not having attended a day of pharmacy school and without a mentor—had mistakenly counseled a patient, then Multicare would be looking at a multi-million tort suit instead of this one.

Plaintiff's remaining claims fail for the same reasons.

## CONCLUSION

Plaintiff appears to simply be an over-eager student whose enthusiasm trumped his better judgment. No reasonable factfinder could conclude that Plaintiff was terminated for discriminatory reasons based on the record before the Court. For that reason, Defendants' Motion for Summary Judgment (Dkt. #38) is **GRANTED**.

Dated this 11th day of April 2013.

　　　　　　　　　　　　　　　　　／s／ Ronald B. Leighton
　　　　　　　　　　　　　　　　　RONALD B. LEIGHTON
　　　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE